**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

```
------------------------------------------------------- x
                                                        :
Eugene C.[1],                                           :           3:22-CV-420 (MPS) (RMS)
     Plaintiff,                                         :
                                                        :
V.                                                      :
                                                        :
KILOLO KIJAKAZI, ACTING                                 :
COMMISSIONER OF SOCIAL                                  :
SECURITY,                                               :
     Defendant.                                         :
                                                        :           DATE:  February 2, 2023
                                                        :
------------------------------------------------------- x
```

**RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE**
**DECISION OF THE COMMISSIONER, OR, IN THE ALTERNATIVE, FOR REMAND**
**FOR A HEARING, AND ON THE DEFENDANT'S MOTION TO AFFIRM THE**
**DECISION OF THE COMMISSIONER**

This is an administrative appeal following the denial of the plaintiff's applications for

disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") and

supplemental security income benefits ("SSI") under Title XVI of the Act.[2]  It is brought pursuant

to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The plaintiff moves for an order reversing the decision of the Commissioner of the Social

Security Administration (the "Commissioner").  (Doc. No. 15).  In the alternative, the plaintiff

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e.*, payment into Social Security through employment for a set period prior to application.  *See* 42 U.S.C. §§ 423(a)(1)(a), *id.* at 423(c)(1).  "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability.  *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013).  *See* 42 U.S.C. § 1382(a).

seeks an order remanding the case for further administrative proceedings. (*Id.*). The Commissioner, in turn, has moved for an order affirming her decision. (Doc No. 18).

For the following reasons, the plaintiff's motion for an order reversing the Commissioner's decision or remanding the case back to the Administrative Law Judge ("ALJ") for a new hearing is **GRANTED in part** and **DENIED in part**,[3] and the Commissioner's motion is **DENIED**.

## I.    PROCEDURAL HISTORY

On May 13, 2017, the plaintiff filed an application for SSI benefits claiming that he had been disabled since April 3, 2017, due to anxiety disorder, depression, sciatica, herniated disk, diabetes, high blood pressure, and sleep apnea.[4]    (Doc. No. 11, Certified Transcript of Administrative Proceedings, dated May 13, 2021 ["Tr."] 18, 260, 983).  On June 23, 2017, the plaintiff also filed an application for DIB benefits claiming that he had been disabled since April 3, 2017, for the same reasons. (Tr. 270).  The plaintiff's applications were denied initially and upon reconsideration. (Tr. 18; 158, 169, 181-197).  On March 11, 2019, a hearing was held before ALJ Alexander Peter Borré, at which the plaintiff and a vocational expert ("VE") testified in person. (Tr. 38-77). The plaintiff was represented by counsel. (*Id.*).  On April 12, 2019, the ALJ issued an unfavorable decision denying the plaintiff DIB and SSI benefits. (Tr. 32).  On June 18, 2020, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On August 20, 2020, the plaintiff filed an action in this Court seeking review of the ALJ's decision. *See Eugene C. v. Comm'r of Soc. Sec.*, 3:20-CV-1224 (RAR) (D. Conn. Aug. 20, 2020).

---

[3] The Court grants the plaintiff's motion to remand the case for further administrative proceedings but denies the plaintiff's request for reversal and the calculation and award of benefits.

[4] The ALJ's April 2019 decision notes the application date as June 20, 2017. (Tr. 18).  The SSI application contained in the record shows a signature date of May 13, 2017, and a receipt date of June 27, 2017. (*See* Tr. 260, 268).

On April 2, 2021, the plaintiff filed his Motion to Reverse The Decision of the Commissioner in that case. *See id*. at Doc. No. 19.  The plaintiff argued that the ALJ committed error by (1) failing to properly analyze the opinion evidence, namely the medical opinion of Dr. Drew Edwards, in accordance with the governing regulations, and (2) not incorporating into his residual functional capacity ("RFC") determination any limitation on the plaintiff's ability to tolerate stress.  *Id.* at Doc. No. 19-1.

On April 27, 2021, the Commissioner moved for a voluntary remand of the case with the consent of the plaintiff so that the ALJ could (1) conduct a new hearing; (2) identify and evaluate all medical opinion evidence in accordance with 20 C.F.R. §§ 404.1520c and 416.920c; and (3) issue a new decision.  *Id.* at Doc. No. 23.  (*See* Tr. 1084-85).  The Court (Richardson, J.) subsequently granted the motion for remand and judgment entered remanding the case back to the agency on April 30, 2021.  (Tr. 1082).  On August 14, 2021, the Appeals Council then remanded the case back to the ALJ with instructions to, *inter alia*, further evaluate the medical source opinion from Mary Lou Oates, LCSW, under the proper regulations and to reconsider the plaintiff's maximum RFC.  (Tr. 1088-90).

On December 21, 2021, ALJ Borré held a new hearing, this time by videoconference and telephone due to the COVID-19 pandemic.  (Tr. 983, 1009, 1011).  The plaintiff was again represented by counsel, and another VE, Louis LaPlante, also testified.  (Tr. 1009).

On January 19, 2022, ALJ Borré again issued an unfavorable decision denying the plaintiff DIB and SSI benefits.  (Tr. 998-99).  It is this January 19, 2022, decision that is at issue here.  In this decision, the ALJ explicitly acknowledged the Appeals Council's directives issued upon remand.  (Tr. 983).  However, the plaintiff did not seek further review from the Appeals Council of this decision nor did the Appeals Council decide to review the claim itself.  The ALJ's decision

thus became the final decision of the Commissioner sixty-one days thereafter on March 21, 2023, at which point the plaintiff could initiate a civil action.[5]

On March 22, 2022, the plaintiff filed his complaint in this pending action.  (Doc. No. 1). On June 14, 2022, absent consent of the parties, the case was transferred to the undersigned for all purposes including issuing a recommended ruling.  (Doc. No. 14).  On July 12, 2022, the plaintiff filed her Motion to Reverse the Decision of the Commissioner, (Doc. No. 15), with a Statement of Material Facts, (Doc. No. 16), and a brief in support. (Doc. No. 15-1).  On September 9, 2022, the Commissioner filed her Motion to Affirm, (Doc. No. 18), with a responding Statement of Material Facts, (Doc. No. 18-2), and a brief in support.  (Doc. No. 18-1).  The plaintiff did not file a reply.

## II.    **FACTUAL BACKGROUND**

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' respective statements of material facts.  (*See* Doc. Nos. 16, 18-1).  The Court cites only the portions of the record that are necessary to explain this decision.

### A.    **The Plaintiff's December 2021 Hearing Testimony**

The ALJ began by acknowledging the case was before him again upon voluntary remand and cited to the instructions of the Appeals Council.  (Tr. 1014).  The ALJ stated that, as he was the prior judge who issued the unfavorable ruling, he was going to "take a fresh look at everything and . . .  come up with a new and independent written Decision[.]"  (Tr.1014).

The plaintiff testified that he had finished the 11th grade and obtained his GED.  (Tr. 1019). The plaintiff stated that his weight had stayed the same since the last hearing and confirmed that

---

[5] As the ALJ's decision provides: "If you do not file written exceptions and the Appeals Council does not review my decision on its own, my decision will become final on the 61st day following the date of this notice. After my decision becomes final, you will have 60 days to file a new civil action in Federal district court. You will lose the right to a court review if you do not file a civil action during the 60-day period starting with the day my decision becomes final." (Tr. 981).

he was right-handed.  (Tr. 1018).  The plaintiff stated he was married with no children under eighteen and lived with his wife.  (*Id.*).  Neither the plaintiff nor his wife was employed at the time; they were assisted by the plaintiff's mother and received governmental benefits.  (*Id.*).  The plaintiff stated he was limited to driving only locally as he would fall asleep while driving longer distances.  (*Id.*).

As to his work experience, the plaintiff testified that he had done yard cleaning work in 2007 and 2008.  (Tr. 1019).  He later worked at a metal machine shop that produced medical supplies for three years.  (Tr. 1019-20).  In his last year at this job, he became a shift supervisor but had to leave after a mental breakdown.  (*Id.*).  The plaintiff explained that he suffered uncontrollable crying spells and "didn't understand why."  (*Id.*).  Despite trying to take a medical leave of absence, discussing his issues with his employer, taking a psychological evaluation, and attending an intensive outpatient program ("IOP"), his emotional state would still not allow him to "run the crew" and, as such, he "had to quit."  (*Id.*).  He explained that it was not the duties of the job that caused his distress but "it was just me, my life, my thoughts."  (*Id.*)

The plaintiff testified that he did not consider his mental status as "stabilized" and explained that he went to a men's group every week for therapy and took his daily medications, such as Clonazepam,[6] but he still had "episodes."  (Tr. 1021, 1022).  He reported that he was on medications for anxiety, depression, high blood pressure, and diabetes and that side effects of these medications were mainly fatigue.  (Tr. 1021).  He said that he was not feeling very motivated. (*Id.*).

---

[6] Clonazepam, also known as Klonopin, is used to treat panic attacks and certain seizure disorders. Drugs & Supplements: Clonazepam (Oral Route), MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/drg-20072102 (last visited January 5, 2023).

As to physical issues, the plaintiff testified that he had lower back pain from his spine "pinch[ing]" his sciatic nerve. (Tr. 1022). He denied any prior surgeries, injections, or use of an assistive walking device or brace. (*Id.*).

As to mental health treatment, he denied any overnight hospitalization for mental health reasons but explained that, at his prior outpatient treatment, he would go to group therapy sessions three times a week. (*Id.*). He stated that, at present, his weekly men's group was his only source of therapy, but he saw a psychiatrist every 60 days who would prescribe him his medication. (Tr. 2022-23). He testified that he smoked a pack of cigarettes a day and was five months sober from alcohol. (*Id.*).

When questioned on what was interfering with his ability to work, the plaintiff replied that the "main thing is I'm not able to control my emotions on a daily basis . . . I don't need for something dramatic to happen to me to just break down and cry . . . and that's a distraction by itself[.]" (Tr. 1024). He explained that, while he worked briefly at his family's vape shop approximately three times a week prior to the pandemic, he was "basically there to sweep up the store because [he] couldn't do anything else." (Tr. 1024-25). He was unpaid for this work. (Tr. 1034). He said he did not do any stocking or lifting of heavy boxes and that he could not deal with customers. (*Id.*). Prior to the pandemic, he would go out to eat every couple of months, but, since the pandemic, he reported "doing nothing." (Tr. 1025-26).

Upon examination by his attorney, the plaintiff further described his mental episodes as having a sudden onset: "out of nowhere I will experience an anxiety attack. . . . I could be having a great day and I just have an anxiety attack. Sometimes just once a day . . . Sometimes like a bad episode is three times in one day that I've experienced." (Tr. 1029). He initially believed them to be heart attacks but learned later that they were anxiety attacks. (*Id.*). He stated that he did not

have enough Clonazepam to deal with three attacks in one day.  (*Id.*).  On average, the plaintiff had two to three panic attacks a week which could take between two-and-a-half to one hours to subside to baseline.  (Tr. 1029-30).  The plaintiff reported that getting "upset" was a trigger that would increase the number of his anxiety attacks.  (Tr. 1030).

The plaintiff also testified that his reaction to stressors had "changed a lot" because of the pandemic and the fact that he was not around people as much.  (*Id.*).  The plaintiff stated that being in crowds and having people next to him had caused him anxiety.  (Tr. 1030-31).  After the pandemic, he explained that even having an unfamiliar person near him would cause him anxiety. (*Id.*).  However, he also reported that, during the summer of 2018, when he would work at the vape shop once a week for an hour, he would "sit down and talk" with customers and neighborhood people.  (Tr. 1032, 1034).  He explained that he felt more comfortable around these customers because they were people more familiar to him and not strangers.  (Tr. 1033).  Still, he reported that, if he got emotional, he would hide in a back room and, if "it got really bad," he would call his wife to pick him up as he could not drive.  (*Id.*).

### B.    The VE's Testimony

The VE classified the plaintiff past relevant work ("PRW") as Inspector, supervisor of machine shop (DOT[7] 603131-010; light exertion level; performed at SVP 7) and as a bench inspector (DOT 609.684.010; light exertion level; SVP 4).  (Tr. 1036-37).  He stated that, from his experience, these jobs were done together and were considered a composite job.  (Tr. 1037).  The

---

[7] The Dictionary of Occupational Titles ("DOT") is an official publication of U.S. Department of Labor and is often relied on by VE's in steps four and five of the disability evaluation "for information about the requirements of work in the national economy."  *See* SSR 00-4P (S.S.A. Dec. 4, 2000) ("The regulations at 20 CFR §§ 404.1566(d) and 416.966(d) provide that [the Commissioner] will take administrative notice of 'reliable job information' available from various publications, including the DOT.").

VE also classified another past relevant job as groundskeeper (DOT 408.681-010; medium exertion level; SVP 2). (Tr. 1038).

The ALJ then posed a hypothetical to the VE, asking him to consider an individual of the claimant's age and education level with the following limitations:

> light exertional level; cannot climb ladders, ropes, or scaffolds; no tolerance of hazards; occasionally climb ramps and stairs, occasionally balance stoop, kneel, crouch and crawl; frequently finger and handle bilaterally; limited to simple repetitive tasks defined as SVP 2 or below, in an environment with no public interaction, no teamwork or tandem style tasks; only simple changes in the work environment.

(Tr. 1039).

The VE testified that a hypothetical individual with these limitations could not perform any of the plaintiff's PRW. (*Id.*). However, he did identify three "light" jobs from the DOT that could be performed by the hypothetical individual, including a line solderer, an injection molding machine operator, and a laundry sorter. (Tr. 1039-40). The VE acknowledged that the DOT's descriptions did not address considerations of changes in the work environment nor the type or frequency of contact with other people. (Tr. 1040). The VE affirmed that his opinion that a hypothetical person could perform these jobs came from "analysis or placement or observation." (*Id.*).

The ALJ then modified the hypothetical to be limited to sedentary jobs with the same non-exertional limitations and asked the VE to identify three such sedentary jobs. (*Id.*). The VE opined that the jobs of eyeglass frame polisher, brake linings coater, and cutter and paster of press clippings could be performed under this second, sedentary hypothetical. (*Id.*). The VE admitted he had not observed any of these jobs personally but chose them because they were assembly jobs that, in his opinion, did not require the individual to work with other people. (Tr. 1041).

The ALJ then inquired whether a hypothetical person who was unable to appropriately interact with coworkers or supervisors at least ten percent of the time due to a crying or "angry episode[s]" would be employable. The VE opined, from his experience, that "if anybody has issues such as crying, which is a little bit more than just wandering off . . . . it does create more of a difficulty than just being off-task so my experience has been that it's not tolerated." (Tr. 1041-42). The VE agreed with the ALJ that conduct such as crying at work would be distracting and serious. (*Id.*).

The ALJ then modified the hypothetical to a person who needed to walk away from his work fifteen percent of the day due to a panic episode. The VE opined that, while this conduct would cause less problems to other workers, employers still would not tolerate an employee being off-task in such a way for more than ten percent of the time. (Tr. 1042). The VE also affirmed that non-attendance from work two times per month would not be tolerated by an employer. (*Id.*).

## III.   THE ALJ'S JANUARY 19, 2022 DECISION

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520(a).[8] With respect to the DIB claim, the ALJ first determined that the plaintiff met the

---

[8] "As the regulations for DIB and SSI are virtually identical and do not differ materially for the purposes of this case, hereinafter reference will be made only to the DIB regulations in the interest of conciseness." *Peterson v. Kijakazi*, No. 3:22-CV-00026 (VLB), 2023 WL 334379, at *5 n.7 (D. Conn. Jan. 20, 2023). *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (explaining in a Social Security case that for "simplicity's sake, we will refer only to the Title II provisions, but our analysis applies equally to Title XVI"). An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id.* If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that she cannot perform her former work, then the burden shifts to

insured status requirements under the Act as the "earnings record show[ed] that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2022.  (Tr. 984-985).[9]

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged onset date of April 3, 2017.  (*Id.*).  While the ALJ acknowledged that evidence in the record showed the plaintiff assisted with the family business, there was no indication that he was compensated for this work in his earnings record.  (*Id.*).  Thus, the ALJ concluded that was not enough evidence to find that he had "worked at levels consistent with substantial gainful activity."  (*Id.*).

At step two, the ALJ determined that the plaintiff had the following severe impairments: diabetes with neuropathy, bilateral knee osteoarthritis, right dupuytren's contracture, obesity, major depressive disorder and generalized anxiety disorder.  (Tr. 986).

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, Subpart P, Appendix 1.  (Tr. 987).  In so finding, the ALJ considered listing 11.14 (neuropathy); 1.18 (knee and hand impairment); 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders).  *See id*.  (Tr. 987-990).  In evaluating the plaintiff's mental impairments under the listings, he also considered both paragraph B and C criteria but found that the plaintiff did not satisfy either.  (Tr. 988-990).

---

the Commissioner to show at step five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[9] As mentioned in note 2, *supra*, SSI benefits do not require this showing.

Next, the ALJ formulated the plaintiff's residual functional capacity.  A plaintiff's RFC is the most they can do despite their impairments and is determined by assessing all the relevant evidence.  20 C.F.R. § 404.1545(a)(1).  The ALJ determined the plaintiff could had the residual functional capacity to perform light work as defined in 20 CFR § 404.1567(b) except the plaintiff could not:

> climb ladders, ropes or scaffolds and cannot tolerate hazards such as open, moving machinery and unprotected heights. The [plaintiff] can occasionally climb ramps and stairs. The [plaintiff] can occasionally balance, stoop, kneel, crouch and crawl. The [plaintiff] can frequently finger and handle bilaterally. The [plaintiff] is limited to simple and repetitive tasks defined as specific vocational preparation two or below in an environment with no public interaction, no teamwork and no tandem style tasks. The [plaintiff] can tolerate only simple changes in the work environment.

(Tr. 990).

At step four, based on the testimony of the VE, the ALJ found that the plaintiff could not perform any of his PRW.  (Tr. 996-997).  At step five, the ALJ concluded that, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the plaintiff could perform.  (Tr. 997). Specifically, relying upon the VE's testimony, the ALJ found that the plaintiff could perform the following jobs: (1) Solderer, Production Line (DOT 813.684-022; light exertion; SVP 2; with 5,100 jobs in the national economy); (2) Injection Molding Machine Operator (DOT 556.685-038; light exertion; SVP 2; with 66,000 jobs in the national economy) and, (3) Laundry Sorter (DOT 361.687-014; light exertion; SVP 2; with 5,200 jobs in the national economy).  (Tr. 998).

Given that the plaintiff could perform this other work, the ALJ found that plaintiff was not disabled under the Act from his alleged onset date to the date of the decision.  (*Id.*).

## IV. <u>STANDARD OF REVIEW</u>

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Substantial evidence means more than a scintilla, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 229 (1938)). Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). "Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). "This [C]ourt must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id.* "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

V.    **DISCUSSION**

The plaintiff argues that the ALJ erred by: (1) formulating an RFC unsupported by substantial evidence because it failed to account for certain nonexertional mental limitations, and (2) failing to properly address the medical opinion of Dr. Drew Edwards under the governing regulations.  (*See generally* Doc. No. 15-1).  The Commissioner responds that the ALJ properly considered plaintiff's physical and mental impairments, and substantial evidence supports the ALJ's RFC finding.  (Doc. No. 18-1 at 4).  For the reasons that follow, the Court concludes that remand is warranted on the plaintiff's second ground.

A.    **The ALJ's RFC Determination Regarding the Plaintiff's Mental Impairments**

The plaintiff argues that the "ALJ's RFC determination is unsupported by substantial evidence as he failed to incorporate any limitation on Plaintiff's ability to handle frustration appropriately, using good judgment, performing activities at a reasonable pace, and persisting in simple activities without interruption from psychological symptoms despite finding the joint [July 2018] opinion of Mary Lou Oates, LCSW and Julie [Flood], APRN [(the "July 2018 Opinion")] persuasive."  (Doc. No. 15-1 at 2).

As an initial matter, "[i]t is the role of the Commissioner, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order).  *Cf. Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").  "Although [courts] do not require that 'every conflict in a record be reconciled by the ALJ . . . we do [require] that the crucial factors in any determination . . . be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

Further, an ALJ's ultimate RFC assessment need not "perfectly correspond with any of the medical sources cited in his decision," as he is "entitled to weigh all of the evidence available to make an RFC finding . . . consistent with the record as a whole." *Kelly W. v. Kijakazi*, No. 3:20-CV-00948 (JCH), 2021 WL 4237190, at *16 (D. Conn. Sept. 17, 2021). "Accordingly, when an ALJ evaluates the record's medical opinions, it is within [his] province . . . to accept parts of a doctor's opinion and to reject others." *Id.* (citation and internal quotation marks omitted).

In the July 2018 Opinion, the plaintiff's treating providers rated him a three out of five in his ability to "us[e] good judgment regarding safety and dangerous circumstances" and opined that his depression and anxiety could "lead to anger, although [the plaintiff] has been doing better with controlling anger." (Tr. 731). A rating of three indicated that the functional ability being addressed was "sometimes a problem, or [indicated] reduced ability." (*Id.*). The plaintiff was similarly marked with a rating of three in (1) his ability to handle frustration appropriately with the opinion that "sometimes [his] wife has to intervene to prevent escalation of anger"; (2) his ability to perform basic tasks at a reasonable pace with the opinion that he was "lacking in motivation"; and, (3) his ability to persist in simple activities without interruption from psychological symptoms with the opinion that he "may zone out; poor motivation impacts functioning." (*Id.*).

In the January 19, 2022, decision, the ALJ indeed found the July 2018 Opinion "persuasive as it is well supported and consistent with the medical evidence." (Tr. 994). The ALJ specifically wrote:

> Reduced abilities were noted with interacting appropriately with others, getting along with others, carrying out single-step instructions, performing at a reasonable pace, persisting in simple activities, caring for physical needs and handling frustration appropriately. All other areas were noted to be average or above.

(Tr. 994).

The ALJ then considered the required supportability and consistency factors, *see* 20 C.F.R. § 416.920c, citing to numerous specific sources and specific pages within the record, as support for his persuasiveness finding.  (Tr. 994).  The plaintiff does not take issue here with the ALJ's persuasiveness assessment.  Instead, the plaintiff argues that the ALJ incorporated "absolutely no" mental limitations from the July 2018 Opinion into his RFC despite the professed persuasiveness of the July 2018 Opinion.  (Doc. No. 15-1 at 5).  This argument is without merit.

First, the formulated RFC specifically stated that the plaintiff could not "tolerate hazards such as open, moving machinery and unprotected heights."  (Tr. 990).  Thus, even if the ALJ did not explicitly address the plaintiff's ability to "use good judgment regarding safety and dangerous circumstances," the ALJ nonetheless clearly considered it and imposed the strictest limitation in the RCF on the plaintiff's ability to do hazardous work.  (Doc. No. 15-1 at 4-5).  "[I]t is well-established that '[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the court] to glean the rationale of an ALJ's decision.'"  *Rodriguez v. Kijakazi*, No. 21 CIV. 2358 (JCM), 2022 WL 3211684, at *12 (S.D.N.Y. Aug. 9, 2022) (quoting *Cichocki*, 729 F.3d at 178) (internal quotation marks omitted); *accord Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983).

The same is true for the plaintiff's assertion that the ALJ's RFC assessment incorporated "absolutely no limitation regarding" the plaintiff's reduced "ability to handle frustration appropriately, perform activities at a reasonable pace, and persist in simple activities without interruption from psychological symptoms."  (Doc. No. 15-1 at 5).  The plaintiff is not correct. The assessed RFC explicitly "limited [the plaintiff] to simple and repetitive tasks defined as [SVP] two or below *in an environment with no public interaction, no teamwork and no tandem style*

15

*tasks.*" (Tr. 990) (emphasis added).  It further limited him to "tolerat[ing] only simple changes in the work environment."  (*Id.*)

This RFC finding is supported by substantial evidence showing that the ALJ considered these limitations, but in weighing the evidence, only found appropriate the limitations set forth in the RFC.  Throughout the decision and in the RFC assessment, the ALJ repeatedly noted the plaintiff's reported nonexertional mental issues such as his problems with controlling stress and anger and his reported poor concentration.  (*See* Tr. 988, 999).  The ALJ also addressed these issues at the hearing when he specifically discussed with the VE the ramifications of anger and crying outbursts on the plaintiff's ability to perform other jobs in the national economy.  (*See* Tr. 1041-42).  Moreover, the ALJ noted that there was evidence indicating that, "throughout the remainder of the relevant period[,] mental status examinations detailed a cooperative nature with a normal mood, normal insight, normal judgment, normal appearance, normal thought process and normal thought content without perceptual abnormalities."  (Tr. 989, 993).  A review of the evidence cited by the ALJ shows that this finding was substantially supported.  For example, mental status examinations performed by APRN Flood herself between March 2019 September 2021 repeatedly showed that the plaintiff's thought process was intact, organized, goal oriented and rational; APRN Flood found him to have fair judgment and fair insight despite his reports of depression and fluctuating levels of anxiety.  (*See, e.g.*, Tr. 1582-83, 1587, 1591, 1595, 1599, 1603 (March -November 2019); 1607, 1612, 1616, 1620, (January-November 2020); 1624, 1628-29, 1635, 1639, 1643, 1647, (April-September 2021)).  Additionally, treatment notes from September 2021 show that the plaintiff had made progress from his August initial admission and was "calm, cooperative, and orientated x3."  (Tr. 1649-52).  According to these notes, the plaintiff acknowledged the triggers of his anger and nonetheless was "contin[uing] to work on developing

positive coping skills" and was reporting "overall stable mood with some lability primarily when angry." (*Id.*).

It is such evidence that "led [the ALJ] to the conclusion that the claimant retained the ability to perform simple tasks in an environment with reduced social contact and only simple changes." (Tr. 993). The plaintiff does not take issue with this divergent evidence as cited or otherwise argue that it was inconsistent with the record. Thus, contrary to the plaintiff's assertions, there exists "an accurate and logical bridge from the evidence to [the ALJ's] conclusion" allowing for meaningful review. *Williams v. Berryhill*, No. 17-CV-6205-FPG, 2018 WL 1663260, at *4 (W.D.N.Y. Apr. 6, 2018) (citation and internal quotation marks omitted); *accord Hamedallah ex rel. E.B. v. Astrue*, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012). (*See* Doc. No. 15-1 at 4 (citing same)).

As the ALJ clearly considered and accommodated for the plaintiff's reduced nonexertional abilities, the plaintiff's issue on appeal appears to be that the ALJ erred in weighing the evidence and not imposing more severe RFC limitations based on the July 2018 Opinion. However, "this [C]ourt may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner." *Kyle Paul S. v. Kijakazi*, No. 3:20-CV-01662 (AVC), 2021 WL 6805715, at *6 n.12 (D. Conn. Nov. 16, 2021). Moreover, it is well settled that, at this stage of the sequential evaluation, the plaintiff, not the Commissioner, carries the burden to prove a more restrictive RFC. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (summary order) (citing 42 U.S.C. § 423(d)(5)) ("[The Plaintiff] had a duty to prove a more restrictive RFC, and failed to do so."); *accord Stonick v. Saul*, No. 3:19-CV-01334 (TOF), 2020 WL 6129339, at *15 (D. Conn. Oct. 19, 2020).

The plaintiff's reliance on SSR 96-8p, "Assessing Residual Functional Capacity in Initial Claims," to show that the ALJ committed error is also unavailing as the plaintiff misreads this guidance.  (Doc. No. 15-1 at 5-6).  The plaintiff cites SSR 96-8p for the proposition that, when "the ALJ has assessed an opinion as persuasive, he must explain the reasons why portions of the opinion were not adopted."  (*Id.*).  However, the section of the SSR 98-8p cited by the plaintiff, entitled "Narrative Discussion," in fact states:

> *Medical opinions*. The RFC assessment must always consider and address medical source opinions. If the RFC assessment *conflicts* with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

SSR 96-8P, 1996 WL 374184 *7 (S.S.A. 1996). (S.S.A. July 2, 1996) (emphasis added).

The ALJ clearly considered and addressed the July 2018 Opinion. Further, the plaintiff has not pointed to any true conflict between the assessed RFC and the July 2018 Opinion that warrants explanation pursuant to SSR 98-8p.  For example, such a conflict may have arisen if the ALJ had found that—despite the July 2018 Opinion—the plaintiff indeed *could* work with the public and with teammates without issue.  *See,* e.g., *Allen v. Comm'r of Soc. Sec.*, No. 7:10-CV-1156 GTS, 2012 WL 4033711, at *8 (N.D.N.Y. Sept. 12, 2012) (finding error in applying SSR 96-8p in part where, "although the ALJ notes that FNP LaFrance's medical source statements from July 2007, and September 2009, indicate that Plaintiff should never crouch or stoop, the ALJ failed to explain why Plaintiff's RFC assessment includes the ability to occasionally crouch and stoop").  Instead, the plaintiff falls back on the same argument that the ALJ "failed to incorporate any related limitations in the RFC."  (Doc. No. 15-1 at 6).  As explained above, this argument fails because the ALJ clearly imposed restrictions limiting the plaintiff's use of dangerous machinery and limiting contact with both members of the public and potential coworkers based on the medical evidence in the record.

Lastly, the plaintiff's contention that the ALJ erred by "not mak[ing] a specific determination regarding Plaintiff's ability to handle frustration as required by SSR 85-15" fails to apprehend the caselaw discussing this Ruling. (Doc. No. 15-1 at 6). SSR 85-15 is entitled "Medical–Vocational Rules as a Framework for Evaluating *Solely* Nonexertional Impairments," *see id.* (emphasis added), and, as that title suggests, it "does not apply to a case, such as this one, in which the claimant suffers from a combination of exertional and non-exertional impairments[.]" *Roma v. Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012) (summary order). *See Wyder v. Colvin*, No. 1:16-CV-00817-HBS, 2018 WL 3866669, at *4 (W.D.N.Y. Aug. 15, 2018) (collecting cases in the Second Circuit "applying [*Roma*'s] interpretation"). As it is undisputed that the plaintiff suffered from "a combination of exertional and non-exertional impairments," SSR 85-15 is inapplicable here and therefore the plaintiff has no grounds for claiming error pursuant to it. *Wyder*, 2018 WL 3866669, at *4. (*See* Tr. 987-90 (addressing both the plaintiff's exertional impairments, such as knee and hand issues, and non-exertional impairments related to depression and anxiety)).

### B.     Dr. Edwards's Opinions

The plaintiff also argues that the ALJ's "RFC determination is unsupported by substantial evidence because [the ALJ] failed to properly analyze the opinion evidence of Dr. Drew Edwards in accordance with the regulations." (Doc. No. 15-1 at 7-9). Specifically, the plaintiff contends that the ALJ "failed to . . . properly consider the supportability and consistency of Dr. Edwards'[s] opinions, particularly with regard to reaching and handling," and instead substituted his own judgment for competent medical opinion. (*Id.* at 7). *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

Because the plaintiff filed his applications after March 27, 2017, (*see* Tr. 18, 260), the new regulations regarding the consideration and articulation of medical opinions apply. *See* 20 C.F.R. § 404.1520c. Under the new regulations, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s). . . including those from [the claimant's] medical sources." *Id.* at § 404.1520c(a). Instead, an ALJ must evaluate and determine the "persuasiveness" of "all of the medical opinions . . . in [the] case record." *Id.* at § 404.1520c(b). "In articulating the persuasiveness of a particular opinion, the ALJ must 'explain how [h]e considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [his] determination or decision.'" *Rodriguez v. Kijakazi*, No. 21 CIV. 2358 (JCM), 2022 WL 3211684, at *11 (S.D.N.Y. Aug. 9, 2022) (quoting 20 C.F.R. §§ 404.1520c(b)(2)). "Supportability concerns the degree to which the objective medical evidence and supporting explanations presented by a medical source support the medical opinion; consistency concerns the degree to which the medical opinion is consistent with the other evidence in the record." *Id.* (internal quotation marks and citation omitted).

"In addition to supportability and consistency, the ALJ must also consider—but need not expound on—three other factors, including (a) the relevant provider's relationship with the claimant (which, in turn, incorporates five sub-factors); (b) specialization; and (c) other factors, *i.e.*, anything else that 'tend[s] to support or contradict a medical opinion.'" *Id.* (citing 20 C.F.R. §§ 404.1520c(b)(2), (c)(3)-(5)). "The specialization factor 'recognizes that a specialist giving an opinion within their specialty may be more persuasive than an opinion given by a non-specialist or a specialist in a less relevant field.'" *Id.* (quoting *Acosta Cuevas v. Comm'r of Soc. Sec.*, 20-CV-0502 (AJN)(KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *report and*

*recommendation adopted sub nom. Cuevas v. Comm'r of Soc. Sec.*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022).

Here, Dr. Edwards issued two opinions, one completed on September 12, 2018, (Tr. 765-67), and another completed on January 2, 2019. (Tr. 912-13). In both opinions, Dr. Edwards opined to the "percentage of time during an [eight]-hour workday during which [the plaintiff could] use" his "hands/fingers/arms" for certain activities. (Tr. 765, 912). Specifically, these opinions indicated that the plaintiff's right hand and right fingers were limited to five percent usage during an eight-hour workday and that the plaintiff could use his arms to reach[10] only fifty percent of an eight-hour workday. (Tr. 765, 912). Notably, both opinions were submitted on a standard "check-the-box" type form without any further attachments of relevant treatment notes or laboratory and test results. (*See id.*).

> In the portion of his decision addressing Dr. Edwards's opinions, the ALJ found:
>
> This opinion is not persuasive as it is not well supported and is not consistent with the medical evidence. Regarding supportability, the opinion form consists solely of boxes that were checked off by Dr. Edwards without citation to objective evidence or further elucidation regarding the reasoning behind the assessed limitations. Turning to consistency, the opinion is inconsistent with the evidence of normal gait, normal, strength and normal sensation.

(Tr. 993-94).

The Second Circuit has repeatedly opined that "there is no rule that 'the evidentiary weight of a treating physician's medical opinion can be discounted by an ALJ based on the naked fact that it was provided in a check-box form.'" *Schillo v. Kijakazi*, 31 F.4th 64, 77 (2d Cir. 2022) (quoting *Colgan v. Kijakazi*, 22 F.4th 353, 361 (2d Cir. 2022)). As the Circuit has "reassert[ed] and clarif[ied]," "the nature of an ALJ's inquiry in disability factfinding turns on the *substance* of the

---

[10] Social Security regulations define difficulties in "reaching" as a non-exertional impairment. 20 C.F.R. § 404.1569a(c)(1)(vi).

medical opinion at issue—not its form—and ultimately whether there is reasonable evidence in the record that supports the conclusions drawn by the medical expert." *Colgan*, 22 F.4th at 361 (emphasis added). While the decisions in *Schillo* and *Colgan* addressed the substance-over-form issue in the context of treating physician opinions under the old treating-source rule in place prior to the new regulations, the underlying principle remains the same: the more a medical opinion is supported by "substance," *i.e.*, "meaningful medical evidence in the administrative record," the more persuasive it may be to the reviewing ALJ under the relevant legal standard. *See Beliana M. C. v. Comm'r of Soc. Sec.,* No. 3:21-CV-00464(SALM), 2022 WL 596045, at *11 (D. Conn. Feb. 28, 2022) (citing *Colgan*, 22 F.4th at 361) (reviewing plaintiff's claim under the new regulations). "[A]n ALJ may, however, discount a treating physician's opinion—regardless of its form—if it is not supported by substantial evidence in the record." *Schillo*, 31 F.4th at 77. *See Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004) (refusing to give controlling weight to a treating physician whose use of a check-the-box from was "not particularly informative" and unsupported by substantial medical evidence, including the opinions of other medical experts). *See also Palmer v. Saul*, No. 3:19-CV-00920(SALM), 2020 WL 4731350, at *6 (D. Conn. Aug. 14, 2020) (opining that forms "which require only that the completing [provider] check a box or fill in a blank, rather than provide a substantive basis for the conclusions stated, are considered weak evidence at best in the context of a disability analysis").

As the ALJ opined in his supportability analysis, there is no question that Dr. Edwards's opinion as to the severely limited capacity of the plaintiff's right hand and fingers was submitted on a "check-the-box" form and that he did not attach to the form any explanatory or diagnostic evidence to support that conclusion. (Tr. 765, 912). Further, these brief forms themselves contain no explanation as to the capacity in which Dr. Edwards saw or treated the plaintiff, his medical

specialty (if any), nor the length or depth of their treating relationship. Thus, standing alone, the opinions do not appear well supported by any medical evidence presented by Dr. Edwards in conjunction with the forms themselves. *See* 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations *presented by a medical source* are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." (emphasis added)). However, Second Circuit precedent guides the Court to determine "ultimately whether there is reasonable evidence in the record that supports the conclusions drawn by the medical expert[.]" *Colgan*, 22 F.4th at 361. *Accord Beliana M. C.*, 2022 WL 596045, at *11. Indeed, the ALJ has a general affirmative duty at the determination stage "to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004) (internal citations and quotation marks omitted).

Looking to the record at large reveals that Dr. Edwards was, in fact, a family practice physician at Prospect Family Medicine who saw the plaintiff at least between May 2017 and December 2018. (*See* Tr. 616, 614, 769, 1276). In fact, the plaintiff had come to Dr. Edwards in August 2018 complaining of, among other things, issues with his right-hand trigger finger and suspected arthritis. (Tr. 772-775). Dr. Edwards noted that the plaintiff presented with "some weakness with grip strength which he thinks is due to his history of punching a lot of things when he was younger, and he has a tethering of a tendon in his hand that is painful, but no trouble with finger locking." Dr. Edwards's physical exam that day showed "[b]ilateral hand decreased grip strength. Right Hand: no erythema, tenderness or warmth and reduced ROM [Range of Motion]; De Quervain's tenosynovitis causing deformity along the flexor tendon of R 3rd finger." (Tr. 775). The record also shows that the same day that Dr. Edwards submitted his first RFC assessment—

September 12, 2018—he had seen the plaintiff, again for right hand pain. The plaintiff's physical exam showed the same issues with his right hand. (Tr. 769)

Upon this full view of the record, the ALJ's finding that Dr. Edwards's opinions were unsupported by objective evidence is erroneous because it is in fact contradicted by medical evidence that was in the record before the ALJ. And not only was this information in record, but the ALJ explicitly cited these same treatment notes—*i.e.*, objective evidence—from Dr. Edwards (and generally reviewed other treatment notes from Dr. Edwards at Prospect Medical Group) in an earlier portion of his RFC assessment discussing the plaintiff's right-hand issues. (*See* Tr. 992). Ultimately, however, the ALJ improperly allowed the form of Dr. Edwards's opinions to dictate their supportive persuasiveness despite being aware of, and previously citing to, Dr. Edwards's earlier examinations of the plaintiff's hands. This error warrants remand. Upon remand, the ALJ shall properly and adequately consider the supportability factor.

The Court also concludes that the ALJ failed to adequately consider the consistency factor. *See* 20 C.F.R. § 404.1520c(c)(2). The ALJ opined that Dr. Edwards's opinions were "inconsistent with the evidence of normal gait, normal strength and normal sensation." (Tr. 993-94). First, gait relates to one's "manner of walking or moving on foot" and has nothing to do with one's ability to handle or finger. *Gait,* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/gait (last visited Jan. 10, 203). Second, even assuming that the ALJ was discussing the strength and sensation of the plaintiff's right hand, the ALJ's review entirely fails to address other contrary opinions from hand specialists who found, in 2019, that the plaintiff had "Dupuytren's contracture of the right hands." (Tr. 1263). Again, the ALJ was clearly aware of this diagnosis because he had found it to be a severe medical impairment and had previously cited to medical notes discussing the issue in his RFC assessment. (*See* Tr. 986, 992). Moreover, "Dupuytren's

contracture is a disorder in which 'the palmar fascia—a fibrous membrane below the skin—becomes progressively contracted, making it difficult to extend one or more fingers.'" *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 354 n.4 (E.D.N.Y. 2010) (quoting 8 Lee R. Russ et al., Attorneys Medical Advisor § 72:27 (2010)).   Such a diagnosis then appears consistent with Dr. Edwards's opinions and inconsistent with a finding of "normal strength and normal sensation" in the plaintiff's right hand.[11]   (Tr. 993-94).

Moreover, this finding is not supported by substantial evidence because the evidence that the ALJ cited for it either primarily predated the August 2018 onset of the plaintiff's complaint of right-hand pain (*see* Ex. 2F, 9F, 11F, 12F, 18F), consisted of general neurological observations without distinguishing hands or feet (Ex. 27F), or was an observation about the plaintiff's feet (Ex. 28F).   (Tr. 994).   Only one treatment note cited by the ALJ, dated February 2020, addressed the plaintiff's hand abilities and found "decreased sensation to light touch appreciated over the fifth digit and lateral aspect of the fourth digit bilaterally" but also found "grip 5/5/ bilaterally."   (Tr. 1541 (Ex. 30F at 154)).

Because the consistency of a medical opinion with other evidence in the record is one of the "most important factors," 20 C.F.R. § 404.1520c(b)(2), in determining a medical opinion's persuasiveness, the ALJ must adequately and properly set out his consistency analysis.   *See Dana Marie M. v. Comm'r of Soc. Sec.*, No. 621-CV-458, 2022 WL 2314560, at *6 (N.D.N.Y. June 28, 2022) ("An ALJ is required to explain his or her consideration of these factors and is not entitled

---

[11] The Court further notes that "Dupuytren's contracture is a painless condition that causes one or more fingers to bend toward the palm of the hand. . . Dupuytren's contracture gets worse slowly, over years. The condition begins with a firm lump in the palm of the hand. This lump might be a little tender, but usually isn't painful."   Mayo Clinic, *Dupuytren's Contracture,* https://www.mayoclinic.org/diseases-conditions/dupuytrens-contracture/symptoms-causes/syc-20371943 (last visited January 10, 2023).   Given that Dupuytren's contracture is progressive and painless disease, the fact that the plaintiff did "not complain of ongoing right hand pain" after March 2019, (Tr. 992), does not lend support to the ALJ's finding that Dr. Edwards's opinions were inconsistent with the record or that, under his assessed RFC, the plaintiff was able to "frequently finger and handle bilaterally[.]" (Tr. 990).

to generally assert that an opinion is 'consistent with' or 'supported by' the record, without further elaboration."); *Pamela P. v. Saul*, No. 3:19-CV-575 (DJS), 2020 WL 2561106, at *5 (N.D.N.Y. May 20, 2020) (finding remand warranted when ALJ's assessment of opinion evidence was "conclusory" and failed to explain exactly how a medical opinion was inconsistent with the medical evidence). Here, the ALJ failed to do so. Upon remand the ALJ should properly address the consistency inquiry in light of the record evidence.

In sum, the ALJ erred in failing to properly assess Dr. Edwards's opinions regarding the plaintiff's abilities to use his right hand. "Handling is 'required in almost all jobs[,] [s]ignificant limitations of . . . handling, therefore, may eliminate a large number of occupations a person could otherwise do.'" *Hilsdorf*, 724 F. Supp. 2d at 354 (quoting S.S.R. 85–15, 1985 WL 56857 *7 (1985)). "Similarly, '[a]s a general rule, limitations of fine manual dexterity have great [] adjudicative significance . . . as the person's exertional RFC decreases,' because they significantly narrow the range of sedentary and light work available to a claimant." *Id.* (quoting same). Thus, this error was harmful, especially in light of the ALJ's ultimate conclusion at step five as to the jobs existing in the national economy that the plaintiff could perform, which all appear to require manual dexterity. For example, according to the DOT's "Selected Characteristics of Occupations . . . the job of a laundry sorter requires frequent reaching, frequent handling, and occasional fingering." *Rivers v. Colvin*, No. 13-CV-4147 (KAM), 2016 WL 1306530, at *16 (E.D.N.Y. Apr. 1, 2016). As such, a remand for a new hearing is warranted.[12]

Additionally, given this error, the Court cannot say that the ALJ's ultimate RFC finding that the plaintiff could "frequently finger and handle bilaterally" was supported by substantial

---

[12] While the plaintiff points out that the VE in the previous 2019 hearing opined that even "occasional" fingering and handling would likely preclude the plaintiff from finding other work in the economy, (Tr. 73-74), this subject was never even broached by the ALJ or the VE in the 2021 hearing at issue here.

evidence. (Tr. at 990). *See Quiles v. Saul*, No. 19-CV-11181, 2021 WL 848197, at *13 (S.D.N.Y. Mar. 5, 2021) ("[T]he ALJ erred in failing to follow the requirements of 20 C.F.R. § 416.920c when evaluating [the plaintiff's] application . . . and therefore, the ALJ's residual functional capacity determination was based on legal error.").

Accordingly, on remand and upon a new hearing, the ALJ should properly and adequately consider all medical opinions in the record, including those of Dr. Edwards, and further reassess the plaintiff's RFC, with specific attention paid to the plaintiff's non-exertional limitations such as his reaching, handling and fingering capacity and its effect on his ability to perform other work. *See Hilsdorf*, 724 F. Supp. 2d at 355. The ALJ shall consult a vocational expert to do so. *See id.*

### C.    Remand for Further Administrative Proceedings Is Appropriate

While the plaintiff requests that the Court enter an order reversing and remanding to the Commissioner for the payment of benefits, (Doc. No. 15), the Court declines to do so. "To award benefits, a district court must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'" *Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *10 (D. Conn. July 20, 2022) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)). The Court has reviewed the entire record and finds that the plaintiff has not provided persuasive proof that, during the relevant time period, he was disabled. There are outstanding issues that need to be resolved by the Commissioner. As such, a "[r]emand for calculation of benefits would [] be inappropriate." *Id.*

### VI.    <u>CONCLUSION</u>

For the reasons stated above, the Court respectfully recommends that the plaintiff's motion for an order reversing or remanding the Commissioner's decision, (Doc. No. 15), be **GRANTED**

**in part** and **DENIED in part** to the extent the plaintiff seeks remand for the payment of benefits. The Court also respectfully recommends that the Commissioner's motion to affirm, (Doc. No. 18), be **DENIED**.

The Court recommends that the case be remanded to the Commissioner to conduct a new hearing and issue a new decision that: (1) properly and thoroughly evaluates the medical opinions under the new regulations, including Dr. Edwards's medical opinions; and (2) reevaluates the plaintiff's RFC.  Further, the ALJ shall inquire as to the plaintiff's nonexertional impairments, specifically his capacity to reach, handle, and finger, and consult a VE as to how any impairments to these capacities would affect the plaintiff's ability to perform past relevant work and find other jobs in the national economy.  Additionally, in his written decision, "the ALJ shall, in accordance with his obligations, make specific findings of exactly what [the p]laintiff can and cannot do, especially with reference to his ability to" reach, handle, and finger.  *Hilsdorf*, 724 F. Supp. 2d at 355.  "If the ALJ chooses to reject any aspects of the [] limitations [the p]laintiff asserts, he must provide sufficient grounds for doing so."  *Id.*

This is a recommended ruling.  *See* FED. R. CIV. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days after filing of such order.  *See* D. CONN. L. CIV. R. 72.2(a). Any party receiving notice or an order or recommended ruling from the Clerk by mail shall have five (5) additional days to file any objection. *See* D. CONN. L. CIV. R. 72.2(a). Failure to file a timely objection will preclude appellate review.  *See* 28 U.S.C. § 636(b)(1); Rules 6(a) & 72 of the Federal Rules of Civil Procedure; D. CONN. L. CIV. R. 72.2; *Impala v. United States Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will

preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

It is so ordered this 2nd day of February 2023, at New Haven, Connecticut.

\_\_\_/s Robert M. Spector_____
Robert M. Spector,
United States Magistrate Judge